# EXHIBIT 1

FILED - AB
GLYNN CO. CLERK'S OFFICE
6/12/2020 2:18 PM
CASE # CE20-00632

*Ronald W. Adams*
CLERK SUPERIOR COURT

# IN THE SUPERIOR COURT OF GLYNN COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| JANICE THERESA DOLLAR, AS | ) |
| PERSONAL REPRESENTATIVE OF | ) Civil Action No. CE20-00632 |
| THE ESTATE OF MICHAEL LAMAR | ) |
| DOLLAR AND INDIVIDUALLY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) |
| | ) |
| MONSANTO COMPANY, | ) |
| | ) |
| DEFENDANT. ) | |

## SUMMONS

TO:   Monsanto Company
      C/O Corporation Service Company
      40 Technology Parkway South, #300
      Norcross, GA 30092

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court

and serve upon Plaintiff's attorney, Todd C. Brooks, Catts & Brooks, LLC, 1529 Reynolds

Street, Brunswick, Georgia 31520, an answer to the Complaint for Damages and Other Relief

which is herewith served upon you, within thirty (30) days after service of this summons

upon you, exclusive of the day of service. If you fail to do so, judgment by default will be

taken against you for the relief demanded in the Complaint.

This 12TH day of June, 2020.

ROBIN MCGREGOR // AB
Superior Court Clerk
Glynn County, Georgia

FILED - AB
GLYNN CO. CLERK'S OFFICE
6/12/2020 2:18 PM
CASE # CE20-00632

CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF GLYNN COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| JANICE THERESA DOLLAR, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL LAMAR DOLLAR AND INDIVIDUALLY, | ) ) ) ) ) |
| PLAINTIFF, | ) ) |
| VS. | ) ) |
| MONSANTO COMPANY, | ) ) |
| DEFENDANT. | ) |

Civil Action No. CE20-00632

### COMPLAINT FOR DAMAGES AND OTHER RELIEF

COMES NOW JANICE THERESA DOLLAR, individually and as Personal Representative of the Estate of Michael Lamar Dollar (hereinafter collectively "Dollar"), and hereby files her Complaint for Damages and Other Relief and respectfully shows as follows:

### I.    INTRODUCTION

1.

In 1970, Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds. By 2001, glyphosate had become the most-used active ingredient in American agriculture.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] *Arthur Grube* et al., U.S. Environmental Protection Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

2.

Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and is the world's leading producer of glyphosate.[2] [3]

3.

Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used[5]. It has been found in food[6], in the urine of agricultural workers[7] [8], and even in the urine of urban dwellers who are not in direct contact with glyphosate. [9]

_____

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.p df.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. Times, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate- background-materials/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans,* 153 Food Chemistry 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study,* 112(3) Environmental Health Perspectives 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/.

[8] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate,* 112 IARC Monographs 76, section 5.4 (2015),        *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine,* 1 Ithaka Journal 270 (2012), *available at* http://www.ithaka- journal.net/druckversionen/e052012-herbicides-urine.pdf.

4.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.

On July 29, 2015, IARC issued the formal Monograph relating to glyphosate. In that Monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.

The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

7.

The IARC evaluation confirms what has been believed for years: that glyphosate is toxic to humans.

8.

Since it began selling Roundup, Monsanto has represented it as safe to humans and the

_____

[10] See, Guyton et. al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

3

environment. Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. Monsanto even made the representation that Roundup is safe enough to drink.

## II.   JURISDICTION AND VENUE

### 9.

Dollar restates and realleges the allegations contained in Paragraphs 1-8 above as if restated and realleged in full herein.

### 10.

This Court has personal jurisdiction over Monsanto because Monsanto knew or should have known (and knows and should know) that its Roundup products were/are sold throughout the State of Georgia. More specifically, Monsanto caused Roundup to be sold to Dollar, Decedent, and/or former employers in the State of Georgia. Monsanto is subject to the jurisdiction of this Honorable Court under O.C.G.A. §9-10-91.

### 11.

Monsanto maintains sufficient minimum contacts with the State of Georgia such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice. Further, Monsanto has purposely availed itself of the privilege of conducting business in the State of Georgia, thereby invoking the benefits and privileges of the State of Georgia and further has purposely directed its activities at residents of the State of Georgia.

12.

Venue is proper in this Honorable Court because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in Glynn County, Georgia.  O.C.G.A. §9-10-93.

### III.    THE PARTIES

13.

Dollar restates and realleges the allegations contained in Paragraphs 1-12 above as if restated and realleged in full herein.

14.

Dollar, individually, is a resident of Glynn County, Georgia. By filing the within action, Dollar has consented to and submitted herself to the jurisdiction and venue of this Honorable Court. Dollar was exposed to Roundup in Georgia from in and around 2000 through the present.

15.

On December 1, 2012, Michael Lamar Dollar ("Decedent") departed this life.  A copy of the Decedent's Death Certificate is attached as Exhibit "A."  On October 7, 2019, Dollar was duly appointed Personal Representative and Executrix of the Decedent's Estate. A copy of the Letters Testamentary is attached hereto as Exhibit "B."  The Decedent was exposed to Roundup in Georgia from in and around 2001 through at least 2010.

16.

Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto regularly and routinely conducts and transacts business within the State of Georgia and specifically Glynn County, Georgia.

5

17.

At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and is the manufacturer of Roundup.

## IV.   FACTS

18.

Dollar restates and realleges the allegations contained in Paragraphs 1-17 above as if restated and realleged in full herein.

19.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

20.

Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

21.

For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a

6

probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup was safe.

### The Discovery of Glyphosate and Development of Roundup

22.

The herbicidal properties of glyphosate were discovered in 1970 by Monsanto. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.[11]   From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.[12]

### Registration of Herbicides under Federal Law

23.

The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the

---

[11] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

7

Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

24.

Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

25.

FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

26.

The EPA and the State of Georgia registered Roundup for distribution, sale, and manufacture in the United States and the State of Georgia.

27.

FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing

8

the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

28.

The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

29.

Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a

9

carcinogen under any circumstances."[13]

30.

On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

31.

In the first instance, Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relations to Roundup.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing produced, including nine of the 15 residue studies needed to register Roundup.

32.

In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

_____

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30- Oct-91_265.pdf.

[14] Monsanto, *Bankgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015),* http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

33.

Three top executives of IBT were convicted of fraud in 1983.

34.

In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

35.

Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

### *The Importance of Roundup to Monsanto's Market Dominance Profits*

36.

The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

37.

Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a

---

[16] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.

11

margin of five to one, and accounting for close to half of Monsanto's revenue.[17]   Today,

glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup*

38.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto

based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit

challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals,

birds, and fish.  Among the representations the NYAG found deceptive and misleading about

the human and environmental safety of Roundup are the following:

> a)  Remember that environmentally friendly Roundup herbicide is
> biodegradable. It won't build up in the soil so you can use Roundup
> with confidence along customers' driveways, sidewalks and fences ...
>
> b)  And remember that Roundup is biodegradable and won't build
> up in the soil.  That will give you the environmental confidence you
> need to use Roundup everywhere you've got a weed, brush, edging
> or trimming problem.
>
> c)  Roundup biodegrades into naturally occurring elements.
>
> d)  Remember that versatile Roundup herbicide stays where you
> put it. That means there's no washing or leaching to harm
> customers' shrubs or other desirable vegetation.
>
> e)  This non-residual herbicide will not wash or leach in the soil.  It. . .
> stays where you apply it.
>
> f)  You can apply Accord with "confidence because it will stay where

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y.
Times, Aug. 2, 2001, *available at*  http://www.nytimes.com/2001/08/02/business/the-power-of-
roundup-a-weed-killer- is-a-block-for-monsanto-to-build-on.html.

you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which had been treated with Roundup.[18]

39.

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

40.

Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

41.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[19]

### Classifications and Assessments of Glyphosate

42.

The IARC process for the classification of glyphosate followed the  stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

43.

The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

44.

One year before the Monograph meeting, the meeting was announced and there was a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership was selected and the sections of the Monograph were developed by the Working Group members.  One month prior to the Monograph meeting, the call for data was closed and the various draft sections distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalized review of all literature, evaluated the evidence in each category, and completed the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings were published in Lancet Oncology, and within a year after the meeting, the final Monograph was finalized and published.

45.

In assessing an agent, the IARC Working Group reviews the following  information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly

---

[20] World Health Organization, *IARC Monographs on the Evaluation of  Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

available and have sufficient detail for meaningful review, and reviewers cannot be
associated with the underlying study.

46.

In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet
Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in
humans.

47.

On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For
Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11
countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain
herbicides, including glyphosate. The March meeting culminated nearly a one-year review
and preparation by the IARC Secretariat and the Working Group, including a comprehensive
review of the latest available scientific evidence. According to published procedures, the
Working Group considered "reports that have been published or accepted for publication in
the openly available scientific literature" as well as "data from governmental reports that are
publicly available."

48.

The studies considered the following exposure groups: occupational exposure of
farmers and tree nursery workers in the United States; forestry workers in Canada and
Finland; municipal weed-control workers in the United Kingdom; and para-occupational
exposure in farming families.

49.

Glyphosate was identified as the second-most used household herbicide in the United

16

States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50.

Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.

The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

52.

The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.

The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.

In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for aemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-

17

promotion study in mice.

55.

The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

56.

The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57.

The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

58.

The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

addition to several other cancers.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

59.

The EPA has a technical fact sheet, as part of its Drinking Water and Health, National

Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact

sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release

patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.
>
> It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.
>
> Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[22]

60.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in

California, the state with the most comprehensive program for reporting of pesticide-caused

illness, glyphosate was the third most commonly-reported cause of pesticide illness amount

---

[22] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

agricultural workers.[23]

### Recent Worldwide Bans on Roundup/Glyphosate

61.

Several countries around the world have instituted bans on the sale of Roundup and

other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in

light of the as the dangers of the use of Roundup are more widely known. The Netherlands

issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which

takes effect by the end of 2015.  In issuing the ban, the Dutch Parliament

member who introduced the successful legislation stated: "Agricultural pesticides in user-

friendly packaging are sold in abundance to private persons.  In garden centers, Roundup is

promoted as harmless, but unsuspecting customers have no idea what the risks of this product

are.  Especially children are sensitive to toxic substances and should therefore not be exposed

to it."[24]

62.

The Brazilian Public Prosecutor in the Federal District requested that the Brazilian

Justice Department suspend the use of glyphosate.[25]

---

[23] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. Pesticide
Reform 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California
agriculture: Strategies and priorities. Environmental Health Policy Program Report,* Univ. of
Cal. School of Public Health, Calif. Policy Seminar (1993).

[24] *Holland's Parliament Bans Glyphosate Herbicides.  The Real Agenda,* April 14, 2014,
*available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[25] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals
Following Recent Glyphosate-Cancer Link,* Global Research, May 14, 2015, *available at*
http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-

63.

France banned the private sale of Roundup and glyphosate following   the IARC

assessment for Glyphosate.[26]

64.

Bermuda banned both the private and commercial sale of glyphosates, including

Roundup. The Bermuda government explained its ban as follows: "Following a recent

scientific study carried out by a leading cancer agency, the importation of weed spray

'Roundup' has been suspended."[27]

65.

The Sri Lankan government banned the private and commercial use of glyphosate,

particularly out of concern that glyphosate has been linked to fatal kidney disease in

agricultural workers.[28]

66.

The government of Columbia announced its ban on using Roundup and glyphosate to

following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at*   http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[26] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen"*, Newsweek, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos- roundup-garden-centers-after-un-names-it-probable-343311.

[27] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at*   http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[28] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

21

destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[29]

### 67.

Many states in the United States also have started banning and/or restricting use of Roundup and Glyphosate including, North Carolina, California, Florida, and many others.

### 68.

Countries that have now banned and/or restricted Glyphosate include Argentina, Australia, Austria, Bahrain, Belgium, Bermuda, Brazil, Canada, Columbia, Costa Rica, Czech Republic, Denmark, El Salvador, France, Germany, Greece, India, Italy, Kuwait, Luxembourg, Malawi, Malta, Mexico, Netherlands, New Zealand, Oman, Portugal, Qatar, Saudi Arabia, Scotland, Slovenia, Spain, Vincent and The Grenadines, Sweden, Switzerland, Thailand, United Arab Emirates, United Kingdom, Vietnam.

### *Dollar and Decedent's Exposure to Roundup*

### 69.

The Decedent Michael Dollar began working at a nursery in Camden County, Georgia in approximately 2001. In that capacity, he used a tractor and 200 gallon tank to spray fields. He also used a backpack sprayer. He also utilized a hand pump sprayer. The primary chemical sprayed was Roundup. During applications, based on Monsanto's misrepresentations, Decedent did not wear protective clothing or equipment. Decedent sprayed on a weekly basis each week of the year. Decedent also used Roundup to spray

---

[29] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

around the house.

70.

In and around 2009, Decedent was diagnosed with multiple myeloma. As a result of

his diagnosis and condition, Dollar underwent extensive, costly, and painful medical

treatment including but not limited to chemotherapy, stem cell transplants, and

hospitalizations. Decedent did not learn the cause of his cancer/condition while alive. In

2019, Dollar, as representative of the Decedent's Estate, discovered the connection between

decedent's multiple myeloma and death and his exposure to Roundup/glyphosate.

71.

On December 1, 2012, Decedent passed away. His cause of death was (A) Multi

organ system failure, (B) Renal failure, and (C) Advanced stage immunoglobulin G multiple

myeloma.

72.

Dollar began working in the horticulture field at least as early as 2000. In that

capacity, she has worked around, handled, and been exposed to Roundup on a daily basis.

Dollar is certified by the State of Georgia and holds a Georgia Pesticide category 23 license.

As part of her licensure, Dollar has participated in numerous classes and continuing

education. None of these classes provided warnings or direction on the hazards of

Roundup/glyphosate. Based on her training and warning labels, Dollar wore/wears

protective clothing and masks when working around other chemicals. However, based on

the misrepresentations of Montano (i.e. that Roundup is safe enough to drink), no such

protective clothing/equipment was used when handling or being exposed to

Roundup/glyphosate. Dollar has sprayed/applied, worked around, handled, and been

23

exposed to Roundup in Camden County and Glynn County, Georgia.

73.

In 2016, Dollar was diagnosed with MGUS (monoclonal gammopathy of undetermined significance). Based on her diagnosis, Dollar faces a likely future diagnosis of multiple myeloma. In the event her MGUS transforms into multiple myeloma, Dollar knows that she too will have to suffer the agonizing pain, misery, and suffering she watched Decedent endure. Dollar learned of the connection between her MGUS/condition and her exposure to Roundup/glyphosate in 2019.

## V.     CAUSES OF ACTION

### CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

74.

Dollar restates and realleges the allegations contained in Paragraphs 1-73 above as if restated and realleged in full herein.

75.

Dollar brings this strict liability claim against Monsanto for defective design.

76.

At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Dollar and Decedent, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to

24

this litigation. Monsanto designed, research, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Dollar and Decedent as described above.

77.

At all times relevant to this litigation, Monsanto's Roundup products   were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Dollar and the Decedent.

78.

At all times relevant to this litigation, Monsanto's Roundup products   reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including Dollar and Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79.

Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.

Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were

defective in design and formulation in that when they left the hands of Monsanto's

manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated

with their design and formulation.

81.

At all times relevant to this action, Monsanto knew or had reason to know that its

Roundup products were defective and were inherently dangerous and unsafe when used in

the manner instructed and provided by Monsanto.

82.

Therefore, at all times relevant to this litigation, Monsanto's Roundup   products,

as researched, tested, developed, designed, licensed, manufactured, packaged, labeled,

distributed, sold and marketed by Monsanto were defective in design and formulation, in one

or more of the following ways:

> a.  When placed in the stream of commerce, Monsanto's  Roundup
> products were defective in design and formulation, and, consequently,
> dangerous to an extent beyond that which an ordinary consumer would
> contemplate.
>
> b.  When placed in the stream of commerce, Monsanto's Roundup
> products were unreasonably dangerous in that they were  hazardous and
> posed a grave risk of cancer and other serious illnesses when used in a
> reasonably anticipated manner.
>
> c.  When placed in the stream of commerce, Monsanto's Roundup
> products contained unreasonably dangerous design defects and were
> not reasonably safe when used in a reasonably anticipated or intended
> manner.
>
> d.  Monsanto did not sufficiently test, investigate, or study its Roundup
> products and, specifically, the active ingredient glyphosate.
>
> e.  Exposure to Roundup and glyphosate-containing products presents
> a risk of harmful side effects that outweigh any potential utility

stemming from the use of the herbicide.

f.   Monsanto knew or should have known at the time of  marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.   Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

h.   Monsanto could have employed safer alternative designs and formulations.

### 83.

Dollar and Decedent were exposed to Monsanto's Roundup products in the course of their employment as nursery and/or horticultural workers, as described above, without knowledge of their dangerous characteristics.

### 84.

At all times relevant to this litigation, Dollar and Decedent used and/or were exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

### 85.

Dollar and Decedent could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

### 86.

The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Monsanto's Roundup products were and are more dangerous

than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time that Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.

At the time Roundup products left Monsanto's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

88.

Monsanto's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Dollar and Decedent herein.

89.

Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Dollar.

90.

The defects in Monsanto's Roundup products were substantial and contributing factors in causing Dollar and Decedent's grave injuries and death, and, but for Monsanto's misconduct and omissions, Dollar and Decedent would not have sustained their injuries, and Decedent would not have lost his life.

91.

Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of

consumers and users of its products, including Dollar and Decedent, with knowledge of the safety problems associated with Roundup and glyphosate- containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

92.

As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Dollar and Decedent have suffered and Dollar will continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including consideration financial expenses for medical care and treatment. Dollar will continue to incur these expenses in the future.

93.

As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Decedent lost his life.

94.

Monsanto's acts and omissions have been intentional, malicious, willful, wanton, fraudulent, and have evidenced that entire want of care justifying the presumption of conscious indifference to the consequences of its actions and justifying an award of punitive damages pursuant to O.C.G.A. §51-12-5.1.

95.

Monsanto has acted in bad faith, been stubbornly litigious and has caused Dollar unnecessary trouble and expense justifying an award of attorney fees and expenses of litigation pursuant to O.C.G.A. §13-6-11.

29

96.

WHEREFORE, Dollar respectfully requests that this Court enter judgment in her favor for compensatory and punitive damages (O.C.G.A. §51-12-5.1), together with interest, costs herein incurred, attorneys' fees (O.C.G.A. §13-6-11), and all such other and further relief as this Court deems just and proper.  Dollar also demands a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

97.

Dollar restates and realleges the allegations set forth in Paragraphs 1-96 above as if restated and realleged in full herein.

98.

Dollar brings this strict liability claim against Monsanto for failure to warn.

99.

At all times relevant to this litigation, Monsanto engaged in the  business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Dollar and Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Monsanto.

100.

Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its

30

Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Dollar and the Decedent, their employers, their co-workers, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

101.

At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Dollar and decedent of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

102.

At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

103.

At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Dollar

31

and Decedent.

104.

Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Dollar and Decedent and the horticultural company which employed them.

105.

Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

106.

At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia, and throughout the United States, including Dollar and Decedent, without substantial change in their condition as designed, manufactured, sold, distributed,

labeled, and marketed by Monsanto.

107.

Dollar and Decedent were exposed to Monsanto's Roundup products in the course of their employment as horticultural workers, as described above, without knowledge of their dangerous characteristics.

108.

At all times relevant to this litigation, Dollar and Decedent used and/or were exposed to the use of Monsanto's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

109.

Dollar and Decedent could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Dollar and Decedent's exposure.  Dollar and Decedent relied upon the skill, superior knowledge, and judgment of Monsanto.

110.

Monsanto knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

111.

The information that Monsanto did provide or communicate failed to contain relevant

33

warnings, hazards, and precautions that would have enabled horticultural workers

such as Dollar and Decedent to utilize the products safely and with adequate protection.

Instead, Monsanto disseminated information that was inaccurate, false, and misleading and

which failed to communicate accurately or adequately the comparative severity, duration, and

extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate;

continued to aggressively promote the efficacy of its products, even after it knew or should

have known of the unreasonable risks from use or exposure; and concealed, downplayed, or

otherwise suppressed, through aggressive marketing and promotion, any information or

research about the risks and dangers of exposure to Roundup and glyphosate.

112.

To this day, Monsanto has failed to adequately and accurately warn of the true risks of

Dollar and Decedent's injuries associated with the use of and exposure to Roundup and its

active ingredient glyphosate, a probable carcinogen.

113.

As a result of their inadequate warnings, Monsanto's Roundup products were

defective and unreasonably dangerous when they left the possession and/or control of

Monsanto, were distributed by Monsanto, and were used by Dollar and Decedent in the

course of their employment as horticultural workers.

114.

Monsanto is liable to Dollar and Decedent for injuries caused by its negligent or

willful failure, as described above, to provide adequate warnings or other clinically relevant

information and data regarding the appropriate use of its products and the risks associated

34

with the use of or exposure to Roundup and glyphosate.

115.

The defects in Monsanto's Roundup products were substantial and contributing factors in causing Dollar and Decedent's injuries and Decedent's death, and, but for Monsanto's misconduct and omissions, Dollar and Decedent would not have sustained their injuries and Decedent's death.

116.

Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Dollar and Decedent could have avoided the risk of developing injuries as alleged herein and the company who employed Dollar and Decedent could have obtained alternative herbicides.

117.

As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, and failure to warn of same, Dollar has suffered and will continue to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Dollar will continue to incur these expenses in the future.

118.

As a direct and proximate result of Monsanto's placing its defective Roundup products into the stream of commerce, and failure to warn of same, Decedent lost his life.

119.

Monsanto's acts and omissions have been intentional, malicious, willful, wanton, fraudulent, and have evidenced that entire want of care justifying the presumption of

35

conscious indifference to the consequences of its actions and justifying an award of punitive damages pursuant to O.C.G.A. §51-12-5.1.

120.

Monsanto has acted in bad faith, been stubbornly litigious, and has caused Dollar unnecessary trouble and expense justifying an award of attorney fees and expenses of litigation pursuant to O.C.G.A. §13-6-11.

121.

WHEREFORE, Dollar respectfully requests that this Court enter judgment in her favor for compensatory and punitive damages (O.C.G.A. §51-12-5.1), together with interest, costs herein incurred, attorneys' fees (O.C.G.A. §13-6-11), and all such other and further relief as and further relief as this Court deems just and proper. Dollar also demands a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

122.

Dollar restates and realleges the allegations contained in Paragraphs 1-121 above as if restated and realleged in full herein.

123.

Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Dollar and Decedent.

124.

At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

36

packaging, sale, and distribution of its Roundup products, including the duty to take all

reasonable steps necessary to manufacture, promote, and/or sell a product that was not

unreasonably dangerous to consumers and users of the product.

125.

At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care

in the marketing, advertisement, and sale of the Roundup products.  Monsanto's duty of care

owed to consumers and the general public  included providing accurate, true, and correct

information concerning the risks of using Roundup and appropriate, complete, and accurate

warnings concerning the potential adverse effects of exposure to Roundup, and, in particular,

its active ingredient glyphosate.

126.

At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable

care, should have known of the hazards and dangers of Roundup and specifically, the

carcinogenic properties of the chemical glyphosate.

127.

Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise

of reasonable care, should have known that use of or exposure to its Roundup products could

cause or be associated with Dollar and Decedent's injuries and thus created a

dangerous and unreasonable risk of injury to the users of these products, including Dollar and

Decedent.

128.

Monsanto also knew or, in the exercise of reasonable care, should have known that

users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

129.

As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

130.

Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

131.

Monsanto's negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and,

38

consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g.  Failing to disclose to Dollar and Decedents, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Dollar and Decedent, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Dollar and Decedent and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.  Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are safe for use in the agricultural and horticultural industries;

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous; and

o.   Otherwise failing to exercise ordinary and reasonable care in the creation, design, manufacture, production, marketing, advertising, sale, and distribution of Roundup.

132.

Monsanto knew and/or should have known that it was foreseeable that consumers, such as Dollar and Decedent, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

133.

Dollar and Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

134.

Monsanto's negligence was the proximate cause of the injuries, harm, economic losses, and death that Dollar and Decedent suffered, and/or will continue to suffer, as described herein.

135.

Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of their products, including Dollar and Decedent, with full

knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Dollar and Decedents. Monsanto's reckless conduct therefore warrants an award of punitive damages.

136.

As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Dollar and Decedent have suffered and Dollar continues to suffer severe and permanent physical and emotional injuries. Dollar and Decedent have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and Dollar will continue to incur these expenses in the future.

137.

As a direct and proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce, and failure to warn of same, Decedent lost his life.

138.

Monsanto has acted in bad faith, been stubbornly litigious and has caused Dollar unnecessary trouble and expense justifying an award of attorney fees and expenses of litigation pursuant to O.C.G.A. §13-6-11.

139.

WHEREFORE, Dollar respectfully requests that this Court enter judgment in her favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees

(O.C.G.A. §13-6-11), and all such other and further relief as and further relief as this Court deems just and proper. Dollar also demands a jury trial on the issues contained herein.

## CLAIM FOUR

## BREACH OF IMPLIED WARRANTIES

### 140.

Dollar restates and realleges the allegations contained in Paragraphs 1-139 above as if restated and realleged in full herein.

### 141.

At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Dollar and Decedent, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

### 142.

Before the time that Dollar and Decedent were exposed to the use of the aforementioned Roundup products, Monsanto impliedly warranted to its consumers— including Dollar and Decedent and their employers—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

### 143.

Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing

products carries an increased risk of developing severe injuries, including Dollar and Decedent's injuries, and Decedent's death.

144.

Upon information and belief, Dollar and Decedent's employers reasonably relied upon the skill, superior knowledge and judgment of Monsanto and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

145.

Upon information and belief, Dollar and Decedent's employer was at all relevant times in privity with Monsanto.

146.

Dollar and Decedent were the intended third-party beneficiaries of implied warranties made by Monsanto to the purchasers of its horticultural herbicides, including the company that employed Dollar and Decedent, and as such Dollar and Decedent are entitled to assert this claim.

147.

The Roundup products were expected to reach and did in fact reach consumers and users, including Dollar and Decedent, without substantial change in the condition in which they were manufactured and sold by Monsanto.

148.

At all times relevant to this litigation, Monsanto was aware that consumers and users of its products, including Dollar and Decedent, would use Roundup products as marketed by

43

Monsanto, which is to say that Dollar and Decedent were foreseeable users of Roundup.

149.

Monsanto intended that its Roundup products be used in the manner in which Dollar and Decedent in fact used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

150.

In reliance upon Monsanto's implied warranty, Dollar and Decedent used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

151.

Neither Dollar and Decedent nor Dollar and Decedent's employer could have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

152.

Monsanto breached its implied warranty to Dollar and Decedent in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

153.

The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and

more dangerous than alternative products.

154.

As a direct and proximate result of Monsanto's wrongful acts and omissions Dollar and Decedent have suffered severe and permanent physical and emotional injuries, and Decedent lost his life. Dollar and Decedent have endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment), and Dollar will continue to incur these expenses in the future.

155.

WHEREFORE, Dollar respectfully requests that this Court enter judgment in Dollar's favor for compensatory and punitive damages (O.C.G.A. §51-12-5.1), together with interest, costs herein incurred, attorneys' fees(O.C.G.A. §13-6-11), and all such other and further relief as this Court deems just and proper. Dollar also demands a jury trial on the issues contained herein.

**CLAIM FIVE**

**WRONGFUL DEATH**

156.

Dollar restates and realleges the allegations contained in Paragraphs 1-155 above as if restated and realleged in full herein.

157.

As a direct and proximate result of Monsanto's wrongful and unlawful acts and omissions, as set forth herein and above, the Decedent sustained and suffered serious bodily injury, requiring hospitalization and extensive medical attention, and ultimately suffered wrongful death.

45

158.

Monsanto is liable for the Decedent's personal injuries and wrongful death.

159.

As a direct and proximate result of the Monsanto's wrongful and unlawful acts and omissions, the Decedent incurred substantial medical and related expenses for which Monsanto is liable.

160.

At the time of his death, Decedent was 58 years old, able bodied, and had a life expectancy of 23 years.

161.

Decedent was a bright, strong, healthy, and energetic father and husband whose life held great promise.

162.

In addition to the loss of the monetary value of the life of the Decedent, he also has lost the value of the intangible aspects of his life, such as his relationship with Dollar and his children and other associated factors such as society, advice, counsel, companionship, and all the other intangible aspects of inestimable value to Decedent, the value of which would have increased as his children grew older.

163.

Dollar has been damaged through losing Decedent and through his wrongful death.

164.

Decedent was married to Dollar at the time of his death.  Dollar, as the Decedent's wife, brings this action under the laws of the State of Georgia, to wit O.C.G.A. §51-4-2, to

recover the full value of the life of Decedent, without any deduction for the necessary and other personal expenses that would have been incurred by the Decedent had he lived.

165.

Dollar, as Personal Representative and Executor of the Estate of Michael Lamar Dollar, brings this action to recover medical and funeral expenses and any and all related expenses. O.C.G.A. §51-4-5(b).

166.

Dollar, as Personal Representative and Executor of the Estate of Michael Dollar, also brings this action to recover damages for the conscious pain and suffering of the Decedent, as result of the Monsanto's negligence and wrongful and unlawful acts and omissions.

167.

In causing the Decedent's wrongful death, the Monsanto acted intentionally, fraudulently, willfully, wantonly, and evidenced that entire want of care justifying the presumption of conscious indifference to the consequences of its actions, and justifying an award of punitive damages under O.C.G.A. §51-12-5.1.

168.

Monsanto has acted in bad faith, been stubbornly litigious, and caused Dollar unnecessary trouble and expense justifying an award of attorney's fees and expense of litigation under O.C.G.A. §13-6-11.

169.

WHEREFORE, Dollar prays that she recover a judgment for the full value of the Decedent's life, compensatory and punitive damages (O.C.G.A. §51-12-5.1), reasonable and necessary expenses, attorney's fees and expense of litigation pursuant to O.C.G.A. §13-6-11,

47

and such other and further relief as the Court deems just and equitable. Dollar also demands a jury trial on the issues contained herein.

## CLAIM SIX

## LOSS OF CONSORTIUM

### 170.

Dollar restates and realleges the allegations contained in Paragraphs 1-169 above as if restated and realleged in full herein.

### 171.

At all relevant times hereto, Dollar was the lawful wife of the Decedent, Michael Lamar Dollar.

### 172.

As a direct and proximate consequence of the wrongful and unlawful acts and omissions of the Monsanto, Dollar has suffered the loss of the Decedent's companionship, services, attention, and consortium, and will continue to suffer such losses in the future.

### 173.

As a direct and proximate consequence of the wrongful and unlawful acts and/or omissions of Monsanto, Dollar is entitled to recover damages for loss of consortium.

## PRAYER FOR RELIEF

WHEREFORE, Dollar prays as follows:

A. That process issue, and that Monsanto be served as provided by law;

B. That she recover a judgment for the full value of the Decedent's life as prayed for herein based upon the Decedent's wrongful death;

C.  That she recover judgment for the Decedent's medical and funeral expenses;

D.  That she recover judgment for Decedent's mental and physical pain and suffering, mental anguish, personal injuries, loss of enjoyment of life and other damages;

E.  That she recover judgment for her pain and suffering, mental and physical, past, present, and future, her mental anguish, her personal injuries, and her other damages;

F.  That she recover compensatory damages in an amount to be proven at trial;

G.  That she recover punitive damages pursuant to O.C.G.A. §51-12-5.1;

H.  That she recover reasonable and necessary expenses;

I.  That she recover her reasonable attorney's fees and expense of litigation pursuant to O.C.G.A. §13-6-11;

J.  That she recover all other available damages and remedies for breach of implied warranties, negligence, strict liability (failure to warn), strict liability (defective design), negligence, and wrongful death;

K.  That she recover all available damages and remedies for loss of consortium; and

L.  That she recover such other and further relief as the Court deems just and equitable.

## JURY TRIAL DEMAND

Dollar demands a trial by jury on all of the triable issues within this Complaint.

This 12th day of June, 2020.

/s/Todd C. Brooks
Todd C. Brooks
Georgia Bar Number: 085550
toddbrooks@cattslaw.com

Catts and Brooks, LLC
1529 Reynolds Street
Brunswick, Georgia 31520
912-261-8448 (telephone)
912-261-7919 (facsimile)

*Attorney for Plaintiff*

49

# GEORGIA DEATH CERTIFICATE

Birth Number

State File Number  2012 00054003

| 1. DECEDENT'S LEGAL FULL NAME (First, Middle, Last) | 1e. IF FEMALE, ENTER LAST NAME AT BIRTH | 2. SEX | 2a. DATE OF DEATH (Mo., Day, Year) |
|---|---|---|---|
| MICHAEL LAMAR DOLLAR | | MALE | ACTUAL DATE OF DEATH  12/01/2012 |

| 3. SOCIAL SECURITY NUMBER | 4a. AGE (YEARS) | 4b. UNDER 1 YEAR | | 4c. UNDER 1 DAY | | 5. DATE OF BIRTH (Mo., Day, Year) |
|---|---|---|---|---|---|---|
| | 58 | Mos. | Days | Hours | Mins. | |

| 6. BIRTHPLACE | 7a. RESIDENCE - STATE | 7b. COUNTY | 7c. CITY, TOWN |
|---|---|---|---|
| FLORIDA | GEORGIA | GLYNN | BRUNSWICK |

| 7d. STREET AND NUMBER | 7e. ZIP CODE | 7f. INSIDE CITY LIMITS? | 8. ARMED FORCES? |
|---|---|---|---|
| | 31525 | NO | NO |

| 8a. USUAL OCCUPATION | 8b. KIND OF INDUSTRY OR BUSINESS |
|---|---|
| HAVAC | HEATING AND AC |

| 9. MARITAL STATUS | 10. SPOUSE NAME | 11. FATHER'S FULL NAME (First, Middle, Last) |
|---|---|---|
| MARRIED | JANICE T VANN | JOSEPH LAMAR DOLLAR |

| 12. MOTHER'S MAIDEN NAME (First, Middle, Last) | 13a. INFORMANT'S NAME (First, Middle, Last) | 13b. RELATIONSHIP TO DECEDENT |
|---|---|---|
| SHIRLEY JANET GOSSELIN | JANICE T DOLLAR | WIFE |

| 13c. MAILING ADDRESS |
|---|
| BRUNSWICK, GEORGIA 31525 |

| 15. ORIGIN OF DECEDENT (Italian, Mex., French, English, etc.) | 16. DECEDENT'S RACE (White, Black, Amer., Indian, etc.) (Specify) |
|---|---|
| NO, NOT SPANISH/HISPANIC/LATINO. | WHITE |

| 17a. IF DEATH OCCURRED IN HOSPITAL | 17b. IF DEATH OCCURRED OTHER THAN HOSPITAL (Indicate DOA, OP/EMER., Res., Inpatient) (Specify) |
|---|---|
| | DECEDENT'S HOME |

| 18. HOSPITAL OR OTHER INSTITUTION NAME (If not in other, give street and No.) | 19. CITY, TOWN or LOCATION OF DEATH | 20. COUNTY OF DEATH |
|---|---|---|
| BRUNSWICK, GEORGIA 31525 | BRUNSWICK | GLYNN |

| 21. METHOD OF DISPOSITION (Specify) | 22. PLACE OF DISPOSITION | 23. DISPOSITION DATE (Mo., Day, Year) |
|---|---|---|
| DONATION | PHILADELPHIA COLLEGE OF MEDICI SUWANEE, GEORGIA 30024 GWINNETT | 12/03/2012 |

| 24a. EMBALMER's NAME | 24b. EMBALMER LICENSE NO. | 25. FUNERAL HOME NAME |
|---|---|---|
| JAMES R BEST | 3856 | EDO MILLER AND SONS INC 1431 |

| 25a. FUNERAL HOME ADDRESS |
|---|
| BRUNSWICK, GEORGIA 31520 |

| 26a. SIGNATURE OF FUNERAL DIRECTOR | 26b. FUN. DIR. LICENSE NO. |
|---|---|
| /S/   JAMES R BEST | 4092 |

| 27. DATE PRONOUNCED DEAD (Mo., Day, Year) | 23. HOUR PRONOUNCED DEAD |
|---|---|
| 12/01/2012 | 09:28 AM |

| 28a. PRONOUNCER'S NAME | 28b. LICENSE NUMBER | 28c. DATE SIGNED |
|---|---|---|
| REBECCA G COFER | 39314 | 12/01/2012 |

| 30. TIME OF DEATH | 31. WAS CASE REFERRED TO MEDICAL EXAMINER |
|---|---|
| 09:28 AM | NO |

32. Part I. Enter the chain of events—diseases, injuries  or complications that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBRIVATE.

| | | Approximate interval between onset and death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | A.   MULTI ORGAN SYSTEM FAILURE | DAYS-WEEKS |
| | Due to, or as a consequence of | |
| | B.   RENAL FAILURE | MONTHS |
| | Due to, or as a consequence of | |
| | C.   ADVANCED STAGE IMMUNOGLOBULIN G MULTIPLE MYELOMA | YEARS |
| | Due to, or as a consequence of | |
| | D. | |

| Part II. Enter significant conditions contributing to death but not related to cause given in Part IA. (If female, indicate if pregnant or  birth occurred within 90 days of death.) | 33. WAS AUTOPSY PERFORMED? | 34. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|---|
| | NO | |

| 35. TOBACCO USE CONTRIBUTED TO DEATH | 36. IF FEMALE | 37. ACCIDENT, SUICIDE, HOMICIDE, UNDERTERMINED (Specify) |
|---|---|---|
| NO | NOT APPLICABLE | NATURAL |

| 38. DATE OF INJURY (Mo., Day, Year) | 39. TIME OF INJURY | 40. PLACE OF INJURY (Home, Farm, Street, Factory, Office, Etc.) (Specify) | 41. INJURY AT WORK? (Yes or No) |
|---|---|---|---|
| | | | |

| 42. LOCATION OF INJURY (Street, Apartment Number, City or Town, State, Zip, County) |
|---|
| |

| 43. DESCRIBE HOW INJURY OCCURRED | 44. IF TRANSPORTATION INJURY |
|---|---|
| | |

| 45. To the best of my knowledge death occurred at the time, date and place and due to the cause(s) stated. Medical Certifier (Name, Title, License No.) | 46. On the basis of examination and/or investigation, in my opinion death occurred at the time, date  and place and due to the cause(s) stated. Medical Examiner/Coroner (Name, Title, License No.) |
|---|---|
| /S/ JOHN E SHANER MD 68178 | |

| 45a. DATE SIGNED (Mo., Day, Year) | 45b. HOUR OF DEATH | 46a. DATE SIGNED (Mo., Day, Year) | 46b. HOUR OF DEATH |
|---|---|---|---|
| 12/06/2012 | 09:28 AM | | |

| 47. NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH |
|---|
| BRUNSWICK, GEORGIA 31528 |

| 48. REGISTRAR (Signature) | 49. DATE FILED - REGISTRAR (Mo., Day, Year) |
|---|---|
| /S/ Deborah C. Aderhold | 12/13/2012 |

Form 3903 (Rev. 11/2008), GEORGIA DEPARTMENT OF HUMAN RESOURCES

DO NOT

EXHIBIT
A

THIS IS TO CERTIFY THAT THIS IS A TRUE REPRODUCTION OF THE ORIGINAL RECORD ON FILE WITH THE STATE
OFFICE OF VITAL RECORDS, GEORGIA DEPARTMENT OF COMMUNITY HEALTH. THIS CERTIFIED COPY IS ISSUED
UNDER THE AUTHORITY OF CHAPTER 31-10, CODE OF GEORGIA. AND 290-1-3 DCH RULES AND REGULATIONS.

County Custodian:

Issued by:

Date Issued: DEC 1 4 2012

**STATE REGISTRAR AND CUSTODIAN
GEORGIA STATE OFFICE OF VITAL RECORDS**

Any reproduction of this document is prohibited by statute. Do not accept unless embossed with a raised seal.

VOID IF ALTERED OR COPIED

**IN THE PROBATE COURT OF GLYNN COUNTY**
**STATE OF GEORGIA**

IN RE: ESTATE OF
MICHAEL L. DOLLAR,
a/k/a MICHAEL LAMAR DOLLAR,
DECEASED                                    ESTATE NO. PRO17239

**LETTERS TESTAMENTARY**
*[Relieved of Filing Returns]*

At a regular term of Probate Court, the Last Will and Testament dated August 21, 2012, of the above-named Decedent, who was domiciled in this County at the time of his death, was legally proven in Solemn Form to be the Decedent's Will and was admitted to record by order, and it was further ordered that JANICE T. DOLLAR, named as Personal Representative in said Will, be allowed to qualify, and that upon so doing, Letters Testamentary be issued to such Personal Representative.

THEREFORE, the Personal Representative, having taken the oath of office and complied with all necessary prerequisites of the law, is legally authorized to discharge all the duties and exercise all powers of Personal Representatives under the Will of said Decedent, according to the Decedent's Will and the law.

Given under my hand and official seal, the _7th_ day of _October_ ____,2019.

_____
Judge of the Probate Court

*NOTE: The following must be signed if the*
*Judge does not sign the original of*
*this document:*

Issued by:                                    *[Seal]*

_____
Clerk of the Probate Court

GPCSF 5                                       Eff. July 2017

EXHIBIT
B